## JEREMIAH LORD *versus* BENAJAH BUFFUM.

It appearing from the report of the presiding Judge that after testimony had been introduced by each party, the plaintiff by consent became nonsuit, with a proviso that the nonsuit was to be set aside, if " the court should decide that the plaintiff could maintain his action on this evidence, or was entitled to have the testimony submitted to the consideration of a jury either upon the point of disseizin or title" — it was held that the latter clause must be disregarded or so limited as restricting the plaintiff's right to a new trial, if the jury might properly find a verdict in his favor — and that by consenting to a nonsuit the plaintiff waived his right to a decision by a jury.

THIS was an action of ejectment, wherein the plaintiff demanded possession of an undivided fourth part of a certain tract of land in North Berwick, describing the same by metes and bounds. The general issue was pleaded.

The plaintiff's title was derived from Nathaniel Hobbs by his deed dated Feb. 12, 1836.

There was evidence introduced, tending to show both that said Hobbs was and was not disseized at the time of this conveyance.

Much evidence in relation to the points in controversy was introduced — but as the testimony upon which the case was decided is fully set forth in the opinion of the Court, it is not here reported.

Upon the whole evidence, EMERY J. who presided at the trial, ruled that the plaintiff could not maintain his action, inasmuch as Nathaniel Hobbs was disseized at the time of the execution of the deed from him to the plaintiff, and that nothing passed thereby ; and by consent, the plaintiff became nonsuit with leave to move, that the nonsuit be set aside and that he proceed to trial, if on the report of the Judge, the Court should decide that the plaintiff could maintain his action on this evidence, or was entitled to have the testimony submitted to the consideration of a jury, either upon the point of disseizin or of title.

*N. D. Appleton* and *D. Goodenow,* for the plaintiff.

*W. A. Hayes* and *Hubbard,* for the defendant.

The opinion of the Court was delivered by

SHEPLEY J. — It becomes necessary to determine what effect the conclusion of the report is to have upon the consideration of the case. Is the nonsuit to be set aside if "the court should decide, that the plaintiff could maintain his action on this evidence, *or was entitled to have the testimony submitted to the consideration of a jury either upon the point of disseizin or title?*" Testimony had been introduced by each party, and it must have been well understood, that the plaintiff was entitled to have it submitted to the consideration of a jury. The report states, and no complaint is made, that it does not correctly state, that "by consent the plaintiff became nonsuit." He could not have intended to reserve his full right to have a decision by the jury after having voluntarily become nonsuit. The two propositions, that "by consent the plaintiff became nonsuit," and that he is "entitled to have the testimony submitted to the consideration of a jury," are inconsistent. To give full effect to one would be to destroy the other. Unless effect is to be given to that, which states, that the nonsuit was entered by consent, the merits cannot be examined or decided by the court; and the effect of saving the case and of hearing an argument will be only to restore it, after the testimony shall have been introduced again, to the same position, as when the nonsuit was entered. The concluding clause of the report must therefore be disregarded, or so limited, as to consider it as restating the plaintiff's right to a new trial, if the jury might properly find a verdict in his favor.

The plaintiff contends that the premises demanded are within the bounds of the mill privilege. The defendant denies it, and contends, that they are within the bounds of the Purington lot. The bounds of the mill privilege are not defined or proved, but it is admitted, that it adjoined the Purington lot on the north. The rights of the parties must therefore, irrespective of the point arising out of an alleged disseizin, depend upon the bounds of the Purington lot. It was pur-

chased of Peter Morrill by John Purington in the year 1783. In the deed of conveyance it is described as "beginning at the northwest corner of my barn, that now stands on the southwest corner of my mill privilege on the east of the highway that leads to Sanford, from thence running southerly snug to my smith shop five rods, thence easterly by the highway two rods and thirteen feet, from thence northerly to the northeast corner of said barn, and from thence to the first beginning."

David Boyd states, that "the blacksmith shop stood in the corner of the Wells and Sanford road." Nathaniel Hobbs says, that it stood at the corner of the Wells road and nearer the corner than the Hubbard store, that it had been down about forty years, that it stood a little further south than Hubbard's store, a few feet more south, more parallel with Wells road than the store, he could not say exactly where it was. Elijah Neal says, it stood about a foot west of Hubbard's store and two or three feet nearer Wells road, Morrill's store stood between Hubbard's store and Wells road, the Morrill store stood thirty or forty years. These witnesses were introduced by the demandant. Huldah Varney, introduced by the tenant, says, the blacksmith shop was on the Wells road. It seemed to be assumed at the argument, that the first line of boundary extended from the corner of the barn southerly to the Wells road. But it extends only snug to the smith shop, which according to the testimony would intervene between the southerly end of the line and the Wells road. And the shop does not appear to have adjoined the Wells road. It is true, that after passing the shop eastward the lot was bounded on the Wells road; but the length of the eastern line of the lot, from the Wells road to the northeast corner of the barn, is not stated in the deed. So that there is no evidence derived from the title deed of the exact distance from the north line of the lot to the Wells road. The five rods appear to have been named as the distance from the corner of the barn to the northerly side or end of the smith shop. What were the dimensions of that shop, and how many feet it stood from the Wells road, does not appear. In the deed from Purington to Hobbs in 1815,

the lot is described as being on the north side of the road lead-
ing to Wells, and it would include the ground on which the
smith shop stood, while the deed from Morrill to Purington
appears to have excluded it; but the length of line on the
Sanford road is not stated in it. This exposition is made, not
without doubt of its accuracy, both because the argument did
not exhibit it, and because a practical construction of the deed
from Morrill to Purington may have included the smith shop.
It is not therefore relied upon in the decision of the case, but
exhibited as affording a possible explanation of the difficulty
in reconciling the length of that line of boundary with the
other testimony in the case.

The northern line of the Purington lot must remain and be
established where the barn stood, if its position at the time of
the conveyance can be clearly ascertained; and by it the rights
of the parties must be determined, although it may be more
than five rods distant from the Wells road. The witnesses dif-
fer much in opinion whether the barn stood as far north as the
tenant contends. But if their opinions be disregarded, and the
attention be confined to the proof of facts, there is much less
difference in the testimony. Nancy Parker, who was the wife
of Benjamin Parker, says — they planted the lot eighteen years,
that the barn was taken down in 1811, that the fence was put
up on the line where the barn stood, that she saw her husband
show Moses Hubbard where the stub was, which was the cor-
ner of the Parker lot, and it was also the southeast corner of
the barn. Moses Hubbard says he occupied the Purington
lot in 1816, that there were marks of a fence there as built and
occupied by Benjamin Parker, that he occupied up to the place
where the fence stood, there was a ridge which shew where
Parker had ploughed, and plain marks, which shew where the
fence stood, the place where the yard was before the barn was
lower, and shew where the barn stood; that in 1824 he put a
shed on, and at the same time fenced his lot with posts and
board fence to enclose the lot; that Parker dug in the ground
and shew him a hub buried in the ground, which was at the
southwest corner of the barn and the northeast corner of his

own lot: that the stub thus shewn was three or four feet west of the southwest corner of the Hussey store, and a few feet south of the store, as the barn was wider than the store; that the store called the Hussey store was built by Joseph Hoag, who held under lease from him. This is the material testimony as to the facts introduced by the tenant on this part of the case. Nathaniel Hobbs says the shed was put where the Hussey store stands, on the land in dispute by Hubbard; that the Hussey store was put on the land in dispute seven or eight years ago; the barn was taken away a great many years ago, and he thinks like enough a fence was put up to enclose the lot to plant potatoes; that Hubbard had the fence on what he called his line; that the store on the lot in dispute was occupied by Joseph Hoag, who held under Moses Hubbard. Elijah Neal says he cannot say where the barn stood. Sheldon Hobbs says the shed was put as far north as the north side of the Hussey store, and that it was put up north of the spot where the barn stood. James Junkins does not remember where the barn stood. This was the substance of the testimony on this point, exclusive of opinions, introduced by the demandant. The only contradictory statement is that of Sheldon Hobbs, that the shed was put up north of where the barn stood; and as it stands, when taken in connexion with his other testimony, is doubtful whether he intended more than to express confidently his opinion. If he did, it is not accompanied by any facts tending to sustain it. The burthen of proof was on the demandant, and a jury would not be authorized on this testimony to find that the northern line of the Purington lot was southerly of the Hussey store. If the demandant were unembarrassed by the alleged disseizin, it is not perceived that he could be entitled to a verdict. He claims by a deed from Nathaniel Hobbs made in 1836. Before that time, according to all the testimony, the Hussey store had been built and was occupied under Hubbard who claimed to own the land. Hobbs does not pretend, that he ever interfered or claimed to do so with that possession; nor does any other witness prove that Hobbs or any other person did. Hubbard's exclusive posses-

sion might be shewn for a longer time, and the apparent inter-
ference of others might be nearly all explained in a manner
rather tending to confirm than to interrupt it, but this is not
necessary. The proof of possession under claim of title is too
conclusively proved, without considering that *the levy* had any
other effect than to transfer it from the debtor to the creditor, to
allow the deed from Hobbs to the demandant to convey the
land, covered by the Hussey store.

*Nonsuit confirmed.*